Pastva *v.* Forge Coal Mining Company,
Appellant, et al.

Argued April 24, 1935.

Before
KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Harry J. Nesbit,* with him *Greer, Fox & Hahan,* for appellant.

*Peter P. Jurchak,* for appellee.

OPINION BY CUNNINGHAM, J., July 18, 1935:

The appeal in this workmen's compensation case is by the employer and its insurance carrier from a judgment entered by the court below, in the amount of $9,405, upon an award of compensation by a referee, affirmed by the board, to the widow of Steve Pastva on behalf of herself and ten minor children.

The death of claimant's husband occurred in a hos-

pital on November 14, 1931, and shortly after an operation necessitated by a strangulated inter-abdominal hernia; the basis of the award was the conclusion of the compensation authorities that his death was attributable to an incident which happened two days earlier in the course of his employment as a coal digger in one of the company's mines.

The underlying and controlling question here involved is whether his death resulted from any "accident," within the meaning of that term as used in Section 301 of our Workmen's Compensation Act of June 2, 1915, P. L. 736. Pastva was 43 years of age and had a long standing ordinary right inguinal hernia, for the control of which he wore a truss.

On the morning of November 12th he went to his regular work in his usual health. When decedent and his "buddy," Charles Pritz, reached their working place in the mine, Pastva said to Pritz, "I will pull the spikes and you get ready and go up to the face and clean out the rock," referring to the iron spikes fastening the rails of the mine track to the wooden ties. The testimony of Pritz continued: "A. Well, he set his dinner bucket down and he says to me, 'I will pull these spikes.' He took a spike bar and goes to pull the spikes, when he started on the first spike he pushed down on it twice and the third time he pushed down real heavy and he hurt his stomach, then he went down about ten or fifteen feet away from me and layed down. ...... I says to him, 'What's the matter, if you are sick, I will take you out.' Then Jack Grundy [mine foreman] came and he says to him, 'What's the matter,' and he said, 'I have the cramps.' Q. Now you say he was using a spike bar? A. Yes. Q. How long is this spike bar? A. Oh, about twenty-six, twenty-eight or thirty inches long, somewhere along there. Q. In diameter, about how thick is it? A. About an inch thick. ...... Q. You say he was trying to pull this spike? A. Yes,

he tried to pull it.  Q.  Show us just how he does that? A.  Well, the bar is about three feet long, I suppose, maybe not quite that long, and he takes it like that (indicating with bar in front of him and pressing down on the bar), and three times he heaved down on it like that.  Q.  Did he put all his strength on it?  A.  That is something I can't say.  Q.  Did the spike come out? A.  No.  Q.  From your observation did it look as though he was tugging hard at it?  A.  Yes, sir. ...... Q.  And did he tell you that morning that he had injured himself in any manner, shape or form?  A.  No, sir.  Q.  He didn't?  A.  No, sir. ...... Q.  Then he didn't remove the spike from the tie at all?  A.  No, sir, I removed the spike. ...... Q.  He did tell you that he had cramps, did he?  A.  Yes, after he started to pull the spike, he said, 'I had a cramp.'  He hold himself that way (indicating with hands across his abdomen) and said, 'I have the cramps.' ...... Q. The first two attempts to remove the spike he didn't say anything or show any signs of pain at all, did he? A.  No.  Q.  And it was only after he had made a rather strenuous effort to remove the spike the third time that he dropped the bar and placed his hands across his stomach, is that correct?  A.  Yes, sir. ...... Q.  Did the prone or the fork of the bar get hold of the spike, or don't you know that?  A.  Yes, he had a hold on it.  Q.  But didn't budge it?  A.  No, sir.  Q.  Was it hard for you to remove?  A.  Yes, sir, it was."

The testimony of the operating surgeon, Dr. L. L. Porch, takes this case out of the scope of the hernia amendment of April 13, 1927, P. L. 186, 189.  In Pollock v. Clairton School District et al., 100 Pa. Superior Ct. 333, we stated that, although under surgical terminology the word "hernia" includes not only the protrusion of the viscera from the abdominal cavity but also the protrusion of any soft internal organ from its normal location—as a hernia of the brain, lung or eye

—the term, as used by the legislature, was intended to include only those ordinary hernias, or "ruptures," which furnish evidence of their presence by a protrusion from some part of the abdominal cavity.

In this case, the surgeon made a clear distinction between the bowel, as the actual "hernia," and the "sac" formed by the long existing ordinary inguinal hernia. The cause of the patient's extremely precarious condition when admitted to the hospital could not be determined without an operation. In his testimony relative to the position and condition of the internal organs involved, the surgeon stated he found, when the abdomen was opened, that upon some previous occasion the old inguinal hernia had been reduced by pushing it back past the ring through which it had descended and that the sac had become fastened to the abdominal wall by old adhesions. This sac, he explained, "started to invert again right through the center to come through the ring, but it was fastened there so that it couldn't come down to the ring." A new hernia occurred by the protrusion of some ten inches of bowel into the inverted portion of the old sac, forming an "intra-abdominal hernia." Something "created pressure and shut off the bowel in there" to such an extent that the portion within the sac had become gangrenous and had to be removed.

The expert opinions relative to any causal connection between the work in which the decedent was engaged and the strangulation of the existing hernia were conflicting. The surgeon said, "Anything might cause it, anything that would create pressure and shut off the bowel in there. . . . . . Pressure will cause a hernia." Another expert testified, "A man could have it lying in bed." The family physician's statement was, "Any strain that brings the abdominal muscles into play, as practically all strains do, it will cause a rupture." In this connection it may be noted that one of the physicians who received Pastva at the hospital testified de-

cedent told him the pain came on during a movement of his bowels after he had entered the mine. Whether this testimony should be accepted as true was for the board; it was rejected.

Granting there was competent testimony from which the referee could find, as he did, that "the decedent's death was the resultant effect of his effort to remove a spike from a tie with a spike bar, the same causing a strangulation of an intra-abdominal hernia," it does not necessarily follow that his death is compensable. It is compensable only if it resulted from some accident—some mishap, some unexpected, undesigned or untoward event, something outside of the usual course of his work.

There is no suggestion that he tripped or slipped or fell—that he was subjected to any external violence or did anything that was not fully intended and designed. No attempt was made to support the averment in the claim petition that, "The bar slipped and hit him in the stomach."

This case is not definitely ruled either by Petrusko v. Jeddo Highland C. Co., 109 Pa. Superior Ct. 288, 167 A. 242, cited in behalf of the employer and insurance carrier, or by Zionek v. Glen Alden Coal Co., 105 Pa. Superior Ct. 189, 160 A. 154, and Tragle v. Hollis Choc. Co. et al., 111 Pa. Superior Ct. 98, 169 A. 472, cited by the claimant.

In the Petrusko case, the decedent went to work in a mine with a descended hernia; it was contended that a sudden effort put forth in alighting from a mine car aggravated the pre-existing hernia and caused it to become strangulated, necessitating an operation which resulted in death. There, the board found that the only effect of the "jar to his body" was the forcing of an additional amount of viscera into the old hernia sac, but not to such an extent as to cause strangulation. One of the physicians said that the decedent's condition

was such that any "ordinary exertion" would have affected the hernia in the same way. It was held that claimant was not entitled to compensation.

On the other hand, compensation was allowed in the Zionek and Tragle cases upon the theory of the aggravation of existing hernias by clear accidents. In the Zionek case, the claimant was a brakeman in a coal mine. Several loaded mine cars were derailed requiring the use by him of an iron instrument approximately 3 feet long, 10 inches wide, ¼ inch thick, and weighing 20 pounds, described as a "retracker." While carrying the "retracker" in his hand, it accidentally hit the car, bounced back, and struck him in the right inguinal region. There was evidence of some discoloration, a red mark, and a slight abrasion of the skin. Upon operation, the surgeon found a sac which he said had all the ear marks of an old hernia, but that the contents came down at the time of the accident. It was held that compensation should be allowed because the hernia was either caused or aggravated by the accident.

In the Tragle case, the claimant was a shipping clerk and was injured in 1931. He had been afflicted with a lateral hernia since 1918, but kept it under subjection by a truss, enabling him to work. In the course of his employment, he "fell astride a ladder while engaged in taking an inventory." The fall rendered him unconscious and the rupture came out from under his truss. An award was sustained because the fall aggravated and caused an enlargement and strangulation of the pre-existing hernia. In the Zionek and Tragle cases there was evidence of an accident in every sense of that word. The theory of the compensation authorities in this case seems to be "over-exertion," but the only finding is that, "he pushed with considerable force." There is no finding that anything he did that morning was outside of the usual course of his regular employment or customary duties.

In 1934, subsequent to this award, we had occasion to consider the question of "over-exertion" in the case of McFadden v. Lehigh Nav. Coal Co., 111 Pa. Superior Ct. 501, 170 A. 314. There, the death of the employee was caused by a cerebral hemorrhage. The medical expert testified that in his professional opinion the exertion put forth by the employee in dragging a heavy stick of timber up a steep rock chute, "was a marked contributory factor" but the death might have occurred while the employee was asleep. The exertion put forth by McFadden seems to have been as great, if not greater, than that shown by the testimony in the case at bar. After referring to the established principles that disability or death overtaking an employee at his work is not compensable unless the result of an accident, and that disability or death merely hastened by the work in which the employee is engaged cannot be treated as accidental, PARKER, J., pointed out that the record in the case then in hand was barren of any evidence showing any undesigned, unforeseen, sudden, or unexpected occurrence. The employee was performing hard labor but precisely the same kind of labor he had been engaged in for a number of years.

With respect to the contention that "over-exertion" during the course of employment may be an accident within the meaning of the statute, it was stated, citing cases, that an examination of the precedents shows that in each case where compensation was allowed there were facts showing something fortuitous or unexpected. Reference was also made to the line of cases in which there was direct evidence of violence to the physical structure of the body, other than such as is immediately connected with a predisposing cause of death; for example, Murray v. Brown et al., 107 Pa. Superior Ct. 516, 164 A. 138, in which death was due to an acute attack of appendicitis caused by the tearing of adhesions around the appendix, and Betts v. American Stores Co.

et al., 105 Pa. Superior Ct. 452, 161 A. 589, where the employee had been suffering from arthritis, and while performing certain labor in an unusual way, injured the processes between the vertebrae of his back. In these cases there was not only a mishap but evidence of injury aside from the chronic condition. After a consideration of all the applicable cases, it was said: "Any confusion that may seem to exist in the decided cases is due to a too literal interpretation of the meaning of the word 'over-exertion' as used by the courts. While light exercise might be sufficient to aggravate an existing condition, yet under the cases to which we have referred it is not alone sufficient to sustain an award of compensation. At the same time, such exertion, although light, might in the broadest sense of the word be referred to as an over-exertion. Over-exertion is to be taken in a limited sense and as used in the cases referred to does not include such exertion as has been usually performed by the particular employee as a part of his labors."

There must be some event outside of the usual course of things, or a sudden development from some abrupt violence to the physical structure of the body, exerted either by the employee or from outside. "The consequences of such exertion may be external or internal, but physical force, violence or strain must be present." Hoffman v. Rhoads Const. Co. et al., 113 Pa. Superior Ct. 55, 172 A. 33.

In the case at bar, there was no "accident," unless the closing of the inverted sac around a portion of the bowel be considered an accident in and of itself. A case of that kind is Keck v. John Mullen Const. Co. et al., 113 Pa. Superior Ct. 564, 173 A. 863. In that case, there was conclusive evidence that the employee had ulcers of the stomach; after lowering two heavy channel irons, by a rope held in his hands, he suddenly collapsed; death followed an operation. The operation disclosed "a perforated ulcer about the size of a silver

dollar with a slit in its center about one-half inch long" and there was positive expert testimony that the perforation resulted from "excessive strain upon the abdominal muscles." Referring to this state of facts, it was there said: "Where ...... there is proof of violence to the physical structure of the body which causes disability or death, that of itself is an accident unless the break, strain, rupture, or the like, is but an element in the natural progress of the disease, occasioned or hastened by the labors regularly performed in one's usual employment."

In the Keck case there was definite medical evidence that the perforation of the ulcer came from "excessive strain upon the abdominal muscles" and that this type of perforation could not have been caused by acidity in the stomach or other causes of ulcers. We also there stated that it was a fair inference that the decedent in that case was not engaged in his usual employment when he was subjected to the excessive strain which caused the perforation. In this connection see also Swiderski v. Glen Alden Coal Co., 114 Pa. Superior Ct. 21, 173 A. 865.

It is difficult to see, under all the evidence, that there is anything more in the case at bar than that Pastva had, for a number of years, an internal abdominal hernia which might at any time become strangulated from any one of many different causes (for the presence of which hernia the employer was in no way responsible) and that while engaged in his ordinary and usual work this hernia became strangulated and the fatal results followed. At least there is no evidence upon this record that he was doing anything unusual or out of the ordinary course of his work at the time the chronic condition of the hernia became acute. The existence of the hernia for a long time distinguishes the present case from that of Pollock v. Clairton School District et al., supra, and brings it within such cases as Pelusi

v. Mandes et al., 109 Pa Superior Ct. 439, 167 A. 456; O'Neill v. Lehigh C. and Nav. Co., 108 Pa. Superior Ct. 425, 165 A. 60, and Mooney et al. v. Yeagle et al., 107 Pa. Superior Ct. 409, 164 A. 82.

Moreover, we are unable to discover any competent evidence from which it could reasonably be found that the strangulation resulted from the application by the decedent of such abrupt violence, force, effort, or strain to the physical structure of his body as is necessary, under our cases, to support the ultimate conclusion of an "accidental" injury, within the intendment of the statute.

As claimant appeared before the referee without counsel and as neither the compensation authorities nor the court below had the benefit of some of the decisions to which we have referred, we think the interests of justice will be best served in this case by returning the record, through the court below, to the board to the end that claimant may be afforded an opportunity to supply, if she can, the defects in proof which we have pointed out, with the right to appellants to present such countervailing evidence as they may deem necessary or proper.

Judgment reversed and record remitted for further proceedings not inconsistent with this opinion.