Fye *v.* Baltimore & Ohio Railroad Co., Appellant.

Argued October 24, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Vincent M. Casey,* for appellant.

*F. Cortez Bell,* for appellee.

OPINION BY CUNNINGHAM, J., December 20, 1938:

The employer in this workmen's compensation case has appealed from a judgment entered below upon an award by the referee, affirmed by the board, of compensation to claimant for the death of her husband, Joshua Fye, employed by it for a number of years as a car repairman.

Notwithstanding some inaccuracies in pleading and the failure of the compensation authorities to make underlying findings which would indicate clearly the sense in which they used the term "over-exertion" in their ultimate finding of fact, the case may be disposed of upon its merits as it now stands. We have examined the record and exhibits, consisting of more than three hundred printed pages, with care and have reached the conclusion the judgment should be affirmed.

The issues upon which the case turns may be clarified by beginning with its medical aspects. Fye died in a hospital at DuBois on November 28, 1935. An autopsy was performed by Dr. J. H. Woolridge and Dr. H. J. Lewis, the coroner of Clearfield County.

No indications of violence to the external physical structure of decedent's body were found. With relation to internal injuries, Dr. Woolridge testified: "Q. From your autopsy were you able to discover what, in your opinion, was the cause of Mr. Fye's death? A. Death was due to strangulation and obstruction of the bowel. It was caught in the right femoral hernial sac. There was a necrosis and perforation of the bowel, and localized peritonitis. Q. Doctor, you call it a femoral hernia. Is that the type of hernia where there is any dropping or protrusion? Is there anything showing externally in that type of hernia? ...... A. No. Q. What is supposed to be a palpable hernia? A. One that you can feel. Q. Was there any hernia that you could feel in this case? A. On the outside of the body, No. Q. Did you open the abdomen? A. Yes. Q. With reference to the gall bladder, what was its condition? A. The gall bladder had been operated before; evidently

drained. There were numerous adhesions. The gall bladder wall was thickened. It contained a number of stones, some sand and thick bile. Q. State whether or not the condition of the gall bladder, in your opinion, had any relation to the cause of death? A. It had not. Q. You said that the obstruction of the bowel or the intestine was caught in a sac? A. Caught in the femoral ring. Q. Was the entire intestine caught in that ring, or not? A. No, just the one half of it. Q. Doctor, when you speak of a ring, is that a breaking of the wall, or do you refer it to a sac? Is there any distinction between a rupture of the membrane and a bulging of the membrane? A. Yes, a rupture would be an actual tearing of the membrane, and in a bulging you usually have, the membrane is stretched, or through an opening without being stretched. Q. Which was it in this case? A. A stretching. Q. No tearing? A. No tearing or breaking. Q. Were you able to form any opinion as to how recent that ring or sac had occurred? A. I may say that the ring is simply the portion through which the sac goes. This sac was of recent origin. There was no scarring of the sac and there were no adhesions. There was only one part of the circumference of the bowel in the sac. The entire bowel had not gone into the sac. From the size of the sac I feel that the bowel had never been in the sac. There had never been any more of it in the sac than at the time we made the examination. Q. Was the bowel perforated? A. Yes, sir. Q. When you use the word perforated, will you define what you mean by the word? Does it mean a breaking of it or a wasting away of it? A. There was a hole in it which is due, normally, to wasting away, or due to gangrene. This is a gangrenous condition. The wall falls out inside instead of being pushed out. ...... Q. Was this such a hernia as would furnish evidence of any protrusion? A. No, there was no evidence on the outside of the body of a sac."

Upon cross-examination the witness, in reply to the suggestion that the strangulation might have been caused by adhesions, said: "A. In this hernia there were no adhesions around there and the sac was thin and it was not dilated below this portion which was jammed in there. Q. You testified awhile ago that you saw adhesions around the gall bladder. Is it not a fact that there were adhesions the whole way down from the gall bladder down into the lower quadrant? A. No, sir."

Dr. Lewis fully corroborated the above quoted testimony of Dr. Woolridge. This evidence excludes this case from the requirements of the "Hernia Amendment" of April 13, 1927, P. L. 186, to the Workmen's Compensation Act of June 2, 1915, P. L. 736, 77 PS §652, (*Pollock v. Clairton School District et al.*, 100 Pa. Superior Ct. 333) and distinguishes it from *Pastva v. Forge Coal Mining Co.*, 119 Pa. Superior Ct. 455, 179 A. 919. Moreover, it also excludes it from that line of cases in which it could reasonably be found that death resulted from the natural progress of a chronic disease with which the employee had been smitten prior to any alleged accident and of which *Pelusi v. Mandes et al.*, 109 Pa. Superior Ct. 439, 167 A. 456; *Amentlar v. New Up. Leh. Coal Co.*, 131 Pa. Superior Ct. 97, 198 A. 678; and *Adams v. W. J. Rainey, Inc.*, 133 Pa. Superior Ct. 550, 3 A. (2d) 270, are examples.

A contrary opinion with relation to the cause of the strangulation and perforation of the bowel was expressed by one medical expert called by the defendant, who saw the body after the post-mortem had been completed, and by three who never saw it. As these opinions were based upon the assumption that there were "adhesions" in the lower right quadrant—an assumption not merely unsupported by, but actually contrary to, the evidence—the referee was fully justified in rejecting them and finding, as he did in his seventh

finding of fact, "that death was not due to the gall bladder condition."

By this process of elimination we arrive at the real issue in the case. Claimant based her claim for compensation upon the theory that the fatal injuries to the internal physical structure of her husband's body resulted from an accident suffered by him in the course of his employment. The question of law with which we are now concerned, therefore, is whether she adduced competent evidence from which the referee and board could reasonably draw an inference that her husband, while performing the work for which he was employed, met with an "accident," within the meaning of the statute and the scope of the decisions construing it.

These facts were shown by uncontroverted testimony: On the morning of November 19, 1935, Fye was engaged, along with a fellow employee, Joe Guvalla, in jacking up the front end of a steel hopper car, weighing approximately 41,500 pounds, preparatory to removing the wheels and trucks for repairs to them. The car, upon which they were working between 7:30 and 8 o'clock that morning, was the second one of a string awaiting repairs. The method used was to lift one end of the car at a time by placing two jacks underneath the end to be raised—one jack at each corner. These jacks weighed about 125 pounds, each, and had a lifting capacity of 15 tons. They were operated by handles or levers, some 45 inches in length. Guvalla testified that while decedent was operating a jack under one corner and the witness another under the opposite corner, decedent said, "Wait a minute; —— damn heavy car," and put up his hands. Guvalla's further statement was, "We wait a couple of seconds and then we change positions and then we start to work again." When the end of the car had been raised the required height, the decedent left and Guvalla did not see him again.

A son of the decedent, Emerson Fye, employed as a

riveter, was working some thirty feet away, and testified that his father came over to him immediately after leaving the car, and, under objection from counsel for the defendant, was permitted to continue as follows: "He told me that it was a heavy car and he complained of his stomach down through here (indicating abdomen). He says, 'I believe I hurt myself on that car.' He told me that the jack slipped also at that particular time." We think this declaration was properly admitted as a part of the res gestae.

At noon, Emerson Fye, after reporting the incident to the foreman and telling him his father was sick and complained of his stomach, took decedent home. That evening, Dr. H. J. Robb, the company doctor, visited him at his home and treated him until the evening of November 21st, when the patient was sent to the hospital; his condition grew progressively worse until his death on the 28th. Dr. Robb, over objection on behalf of the defendant, was permitted to testify with relation to the history given him by decedent of the injury as follows: "He stated that while he was working that morning he was jacking up a car and during the process of jacking up the car he felt a sensation of a giving way in his abdomen." This testimony seems to have been admissible as "a necessary variant of the hearsay rule": *Roberts v. Pitt Publishing Co.,* 330 Pa. 44, 198 A. 668.

The referee improperly admitted evidence of a number of declarations made by the decedent to members of his family and to callers while he was in the hospital, but disregarded them in his findings.

Another declaration of the decedent, the making of which was not controverted, was testified to by Harry Reisinger, a fellow employee, under the objection that it was hearsay. This witness, referring to a time between 9:30 and 10 o'clock on the morning of the occurrence, said: "That morning I can remember I started over to eat a lunch and I started out and was eating it

when I seen him coming across from the pipe shop. I says, 'What's the matter, Josh, you look kind of white under the gills?' He said, 'I believe I hurt myself on a jack over there.' I never said a word to the man after that." In view of all the circumstances, this testimony was probably inadmissible, but as the controlling facts of the case were established without depending in any way upon it, we need not pass definitely upon its admissibility.

Several controverted issues of fact developed in the course of the hearings. Emerson Fye, in addition to testifying to the above quoted declarations of his father, also said he was watching his father at the time the latter was jacking up the car, and continued: "I noticed that it was a heavy car, and the amount of strength that [it] took to jack it up, and the jack slipped at the time he was jacking it, or the time he was operating it. . . . . . . He put the lever on down so as to fasten it, I suppose would be his idea." The credibility of this testimony was attacked. As the referee made no specific finding that the jack slipped, we assume he did not credit the son's testimony upon this point and we, therefore, need not give it any further consideration.

The seventh finding of the referee, to which we have already referred, reads in full: "That from all the evidence in this case, your referee finds as a fact that the death of the decedent was caused by strangulation of the bowel as the result of an extra lift and over-exertion on the part of the decedent in raising the steel car by means of the jack, which caused the strangulation, subsequent disability and then death, and that death was not due to the gall bladder condition as alleged by the defendant's medical witnesses."

When the record is viewed as a whole, it is apparent that the referee did not use the term "over-exertion" in his seventh finding of fact in the limited and discriminating sense described by PARKER, J., at page 507 of the opinion written by him in *McFadden v. Lehigh Nav.*

*Coal Co.,* 111 Pa. Superior Ct. 501, 170 A. 314. Under the findings, this is not a case in which an employee abruptly expended unusual and excessive force or effort by reason of some unexpected external happening. The statement of Guvalla was that they were doing their work "just as usual—just as we had every day." As above stated, the referee made no finding that the jack or the handle by which it was operated slipped, nor did he make any finding upon the controverted contention in behalf of claimant that two men were usually assigned to each jack when a car of the size and weight of the one in question had to be raised.

But it is a case where an employee, performing hard work of the same kind and in the same manner he had been doing it for years, sustained an unusual and not to be expected injury to internal organs of his body which were not affected by any pre-existing disease—an injury which was not the natural or probable result of what he was doing.

In our opinion, this is the line of demarcation as to compensability in cases in which no external mishap is shown. Each case must be decided upon its own facts. Where disability or death has been merely hastened by the effect of even hard labor, performed in the usual way, upon an organ or organs impaired by a disease—other than an occupational one—the employer is not required to pay compensation. It was the application of these principles that placed the Pelusi, Amentlar and Adams cases, supra, and kindred cases, upon the non-compensable side of the line.

On the other hand, if the disabling or fatal injury is to an organ in a normal and healthy condition, or if the organ, although not sound, has been affected by the injury in a way not attributable to the natural progress of a disease *(Keck v. John Mullen Const. Co. et al.,* 113 Pa. Superior Ct. 564, 173 A. 863; *Betts v. Amer. Stores Co.,* 105 Pa. Superior Ct. 452, 161 A. 589), the happening of an "accident," within the meaning of

the statute, may be inferred from the surrounding circumstances: *Witt v. Witt's Food Market et al.,* 122 Pa. Superior Ct. 557, 186 A. 275, and cases there cited.

In the Betts and Witt cases the respective employees were lifting or carrying heavy pieces of beef; in the former the injury was to the spinal nerves, and in the latter to the heart; in both, there was evidence of an injury aside from the natural progress of any chronic condition. In illustrating that the sustaining of an injury while performing labor, in the usual way and without over-exertion, may of itself justify an inference of "accident," and thereby make the injury an "injury by an accident," within the meaning of the statute, PARKER, J., said in the Betts case: "One walking on a smooth pavement may turn his ankle in such a manner as to result in injuries that would prevent him from performing physical labor for some time and it would scarcely be contended that this would not be an accident. In such a case, it is not the walking, which is usual and ordinary, but the turning of the ankle that is a mishap or accident. In the case we are considering, it was not the carrying of the beef but the bending of the spine in such a manner as to pinch the nerves, with resulting inflammation, that constituted the accident."

This excerpt from the opinion written by RHODES, J., in the Witt case is applicable here: "The argument is urged by appellant that the lifting which claimant did at the time of the alleged accident was of the kind he was accustomed to do as a part of his regular work, and that such lifting did not constitute an accident. It is not the lifting that constitutes the accident, but the strain or sprain resulting therefrom and causing 'violence to the physical structure of the body.' "

This record contains competent evidence that the death of claimant's husband was attributable solely to an injury—the intra-abdominal hernia—sustained in the course of his employment, and that the abrupt and

violent disarrangement of the organs was an unusual and not to be anticipated result following the intra-abdominal pressure or strain which occurred while he was operating the jack in his accustomed manner.

In reply to the question, "Whether or not it [was his] professional opinion that this strangulation was caused by effort or strain," Dr. Woolridge answered, "Yes, I do."

Dr. Lewis was of the same opinion as shown by these portions of his testimony. "Q. Doctor, from your knowledge and experience as a practicing physician, state the usual cause of hernias such as the type you found in Joshua Fye? A. They are usually referred to as traumatic hernias. Q. And by traumatic, you mean what? A. I mean increased abdominal pressure. ...... Q. From what evidence you heard state whether or not Joshua Fye could have suffered his hernia while engaged in lifting the car with the jack? A. Yes. ...... Q. What is your best professional opinion as to the cause of this strangulation? A. Well, it would be generally my opinion that it would be caused by some intra-abdominal pressure such as has been described here that he went through." Dr. Robb, the company doctor, said, "A strain could cause it."

We agree with the court below that claimant successfully carried the burden of showing by competent evidence that her husband's death was the result of an "accident" within the intendment of our Workmen's Compensation Act.

Judgment affirmed.