Kearns v. Harmony Short Line Motor Transportation Co. (et al., Appellant).

Argued April 11, 1940. Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*John M. Reed,* for appellant.

*James R. Orr,* with him *Peter Cooper* and *Howard Zacharias,* for appellee.

OPINION BY STADTFELD, J., June 25, 1940:

This is a workmen's compensation case in which the referee made an award in favor of claimant, affirmed by the Workmen's Compensation Board on appeal and judgment thereon entered by the court of common pleas. This appeal by the Hartford Accident and Indemnity Company, insurance carrier and intervening defendant, followed.

Claimant is the widow of Glenn B. Kearns, a bus driver, who died at Franklin Hospital, Franklin, Pennsylvania, on November 25, 1938. He left to survive him, his widow, Muriel E. Kearns, and a minor child, Patricia Helen Kearns.

Glenn B. Kearns was employed by the defendant to drive a passenger bus between Pittsburgh and Franklin and Oil City. He resided at Zelienople, Pennsylvania, but his run required him to stay overnight at Franklin. His wife accompanied him on the last trip which he made before his death. Her testimony is the only evidence of what took place while he was at work and during the period before a doctor was called to attend him.

Medical testimony was given by Dr. William F. Brehm who attended decedent and performed an autopsy, by Dr. G. C. McCandless who attended decedent at Franklin Hospital, performed an exploratory operation upon him and assisted at the autopsy, and by Dr. Joseph T. Danzer, who made X-ray plates on November 23-24, 1938.

The claimant testified that she accompanied her husband on the regular run of the bus which left Pittsburgh at 1:00 P. M. on November 22, 1938. The run was to Franklin, then to Oil City, and from there to Union City where the run was completed. At that point, claimant and decedent had dinner and decedent drove the bus back without passengers, to Franklin for the purpose of placing it in the garage where it was customarily kept. In order to get the bus into the garage which was on a level street and of usual width, it was necessary to cut the wheels and back three times. After decedent turned the wheel preparatory to making the second cut, he jumped off the seat and complained of a pain above his stomach. The pain did not last, and he completed the operation of placing the bus in the garage. When he got into the garage, he had another pain although apparently not quite as severe as the first one. After placing the bus in the garage, he got out and remarked that he thought he had indigestion and stated that he was going to get an alka-seltzer. He walked into the drugstore which was several blocks away, sat there for ten or fifteen minutes and drank an alka-seltzer. He then walked with his wife to the hotel where he had a room regularly engaged. About an hour and a half later, between 10:00 and 10:30 P. M., Dr. Brehm was called, who originally diagnosed the trouble as indigestion, gave Kearns some pills and made him vomit. He also gave him a hypodermic of morphine. When Dr. Brehm left, Kearns was resting comfortably and was ready to go to sleep. The doctor called again the next morning at 9:30 and found that

he had been fairly comfortable during the night, but pain recurred during the morning. In view of the recurrence of pain, Dr. Brehm had the patient taken to Franklin Hospital, where he was examined by Dr. G. C. McCandless. X-rays were taken in the afternoon by Dr. Joseph T. Danzer. Because the nature of the condition could not be diagnosed, an exploratory operation was decided upon. This was performed by Dr. McCandless at 10:00 P. M. No definite pathological conditions were found although the abdomen was markedly distended. The incision was closed with the belief that the pathological lesion was definitely above the diaphragm. Following the operation, patient's condition became steadily worse and he died on November 25, 1938, at 1:00 P. M.

Dr. Brehm performed an autopsy at which Dr. McCandless was present. They testified that they found a small slit or opening in the diaphragm through which a portion of the transverse colon and a portion of the omentum had protruded into the pleural cavity and had become incarcerated and strangulated to the extent that they appeared as a hemorrhage mass. The opening in the diaphragm was about a centimeter or a little less than one-half inch in length and was on the anterior slope of the left side of the diaphragm. It was not at a point where congenital weakness is usually found and there was no sac present.

The X-ray plates taken on November 23, 1940, did not show gas above the diaphragm and, therefore, diagnosis of the existence of a hernia on that day could not be made.

The decedent was 26 years of age, six feet one inch in height, and weighed 190 pounds. He had never complained and had never been sick.

The defendant offered no evidence.

The sole question involved is, did the decedent meet his death as the result of an accident within the meaning of the Workmen's Compensation Act.

Dr. William F. Brehm testified: "The cause of the death was the apparent rupture of the diaphragm allowing the omentum and small bowel to herniate through that opening. Q. What had caused this rupture, if you know? A. Probably internal pressure. Q. Well, from the history you received, which has been verified by the widow's testimony today, what caused that internal rupture? ...... A. I would assume that it was the strain of turning the wheel of the bus—a muscular strain. ...... Q. How much of an examination did you make of him on the first occasion you were called to the hotel? A. I made quite a thorough examination of both his chest and abdomen, the type of examination which you could do with a stethoscope and your hands. Q. This was at the hotel? A. Yes. Q. And you did have some conversation with him? A. Oh, yes. Q. In which he detailed to you what was the trouble? A. What happened, yes. Q. Did he tell you that while he was attempting to get this bus into the garage he was operating the wheel and the pain happened at that time? A. He said that he had it while he was turning the wheel. He was sitting in the seat turning the wheel, but he didn't make any reference whether he was going forward or backward or anything like that. ...... Q. Doctor, from the history you received from Mr. Kearns on the night of the accident, that as he was turning the wheel to operate the bus, that he felt a pain on the left side in the upper left quadrant, and that the pain continued intermittently and then from what you observed when you were called on to treat him professionally that night, and from your continued observations of him at the hospital and from the post-mortem examination which you made, in your professional opinion, was there any connection between the hernia and the turning of the wheel on the night of the 22d day of November, 1938? ...... A. In view of the statement made and the subsequent findings at autopsy, I would believe that there is a direct connection between the strain at the time of turn-

ing the wheel and the occurrence of the hernia. Q. That is your professional opinion? A. Yes."

Dr. G. C. McCandless testified in part as follows: "Q. ...... was there any relation between the man's death and what happened as he was turning the wheel of the bus? A. There is a very definite relation in my opinion. Q. What is that relation? A. That is that this man did have a rupture of his diaphragm at the time of this severe pain while he was manipulating this car into the garage, which resulted in a herniation of the contents mentioned which became strangulated and gangrenous and caused this man's death. Q. What caused that rupture, Doctor, if you know? A. The rupture is caused by a strain. That is, I mean by that the muscular energy in pulling or turning or hanging on this wheel sufficient to cause intra-abdominal pressure to the extent as to cause a spread of fibers in the diaphragm. Q. Doctor, is this sort of a hernia, at this particular place a usual thing or not? A. It is not the usual thing, no. Q. In your professional opinion from what observation you made of this man's condition after his death and before that time, and from your observation of this herniated portion, can you state whether or not a usual or unusual amount of exertion would be required in order to cause a sufficient strain to result in this hernia? A. I would think that it would require an unusual amount in view of the fact that this man had been active, had been doing hard work all his lifetime, and he had never had a rupture before this time. Q. Doctor, where you have a hernia of the sort you have here, is there pain immediately on the herniation or not? A. Very definite immediate pain. Q. In this particular type of hernia would you have the herniation without pain? A. No, indeed you wouldn't."

The referee found, inter alia, as follows: "Sixth: In the effort to place said bus in the garage, the decedent suffered a strangulated diaphragmatic hernia, which was due to the exertion or intra-abdominal pressure

caused by turning or twisting the steering wheel of said bus. Seventh: The decedent, at the time of the alleged accident, was 26 years of age, and prior thereto had always enjoyed good health and was able to perform his usual work. Eighth: The death of the decedent resulted from the unusual strain or exertion in turning the steering wheel of said bus."

The Workmen's Compensation Board was of the opinion that the testimony warrants these findings and the award.

After a careful reading of the testimony, we are of the opinion that the evidence amply sustains the finding that death was caused by a strangulated diaphragmatic hernia which followed the exertion of an unusual amount of pressure as the decedent was turning the wheel of his bus.

Defendant contends that the testimony does not show an accident and has cited, inter alia, *Adamchick v. Wyoming Valley Collieries Co.,* 332 Pa. 401, 3 A. 2d 377; *Gausman v. R. T. Pearson Co.,* 284 Pa. 348, 353, 131 A. 247 and *Harring v. Glen Alden Coal Co.,* 332 Pa. 410, 3 A. 2d 381. These cases are readily distinguishable from the instant case. In the Adamchick case, the Supreme Court was of the opinion that there was no evidence whatsoever from which an accident might be inferred, and that it could not be inferred from the injury itself. In the Harring case, the decedent died as a result of a heart condition, the court stating, "In this case there was no evidence of an injury resulting from an accident and all of the competent evidence established that decedent died exclusively from natural causes." In the case of *Gausman v. Pearson Co.,* supra, it appeared that the disability could have been caused either by a stroke of apoplexy or by heat exhaustion.

Quoting from *Lacey v. Washburn & Williams,* 309 Pa. 574, 578, 164 A. 724, "That which distinguishes an accident from other events is the element of being unforeseen; an accident is an occurrence which proceeds

from an unknown cause, or which is an unusual effect of a known cause, and hence unexpected and unforeseen."

The case of *Fye v. B. & O. R. R. Co.*, 133 Pa. Superior Ct. 550, 3 A. 2d 275, presents facts in many respects similar to those in the instant case. In the Fye case, the decedent was engaged in jacking up the front end of a steel hopper car. He complained that the car was very heavy and that he thought he had hurt his stomach. His condition became progressively worse and he died as a result of the strangulation of the bowel, which had herniated, and the referee so found. In upholding the award of compensation, this court stated, in an opinion by Judge CUNNINGHAM, p. 557: "But it is a case where an employee, performing hard work of the same kind and in the same manner he had been doing it for years, sustained an unusual and not to be expected injury to internal organs of his body which were not affected by any pre-existing disease—an injury which was not the natural or probable result of what he was doing. ......

"On the other hand, if the disabling or fatal injury is to an organ in a normal and healthy condition, or if the organ, although not sound, has been affected by the injury in a way not attributable to the natural progress of a disease (*Keck v. John Mullen Const. Co. et al.*, 113 Pa. Superior Ct. 564, 173 A. 863; *Betts v. Amer. Stores Co.*, 105 Pa. Superior Ct. 452, 161 A. 569), the happening of an 'accident', within the meaning of the statute, may be inferred from the surrounding circumstances: *Witt v. Witt's Food Market et al.*, 122 Pa. Superior Ct. 557, 186 A. 275, and cases there cited.

"In the Betts and Witt cases the respective employees were lifting or carrying heavy pieces of beef; in the former the injury was to the spinal nerves, and in the latter to the heart; in both, there was evidence of an

injury aside from the natural progress of any chronic condition. ......

"This record contains competent evidence that the death of claimant's husband was attributable solely to an injury—the intra-abdominal hernia—sustained in the course of his employment, and that the abrupt and violent disarrangement of the organs was an unusual and not to be anticipated result following the intra-abdominal pressure or strain which occurred while he was operating the jack in his accustomed manner."

In a very recent case in this court, *Camilli v. Penna. R. R. Co.*, 135 Pa. Superior Ct. 510, 513, 514, 7 A. 2d 129, the opinion by Judge HIRT stated: "Where the injury is wholly within the body, proof of the accidental cause must rest upon circumstances attending it. *Betts v. American Stores Co.*, 105 Pa. Superior Ct. 452, 161 A. 589; *Roland v. Frantz*, 134 Pa. Superior Ct. 24, 3 A. 2d 279. Particularly is this true of a hernia, an injury which often results from lifting a weight not in itself excessive, but done in such a manner as to produce undue strain. The posture of the individual while lifting, and not the weight, may determine the result. An injury so caused may be regarded as an unexpected or fortuitous event or happening. 'It is not the lifting that constitutes the accident, but the strain or sprain resulting therefrom ...... An injury by accident may occur in the course of the normal duties of an employee, and without over-exertion, when a strain, sprain, or twist causes a break or sudden change in the physical structure or tissues of the body:' *Witt v. Witt's Food Mkt.*, 122 Pa. Superior Ct. 557, 186 A. 275."

The assignments of error are overruled and judgment is affirmed.